**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **CONNIE L. HONEYSETT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:11-CV-00369** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Connie Honeysett, on the behalf of her daughter, Jade Chadwick,[1] appeals to the

district court from a final decision of the Commissioner of Social Security ("Commissioner")

denying Chadwick's application under the Social Security Act (the "Act") for a period of

disability and Disability Insurance Benefits ("DIB").[2] (Docket # 1.) For the following reasons,

the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Chadwick was last insured for DIB on March 31, 2007 (Tr. 18), and, therefore, she must

establish that she was disabled as of that date to recover DIB benefits, *Stevenson v. Chater*, 105

F.3d 1151, 1154 (7th Cir. 1997). In December 2006, Chadwick applied for DIB, alleging

_____

[1] After the hearing decision and before the appeal was filed in this Court, Chadwick passed away, and
Honeysett, her mother, was substituted as the party of interest. (Opening Br. of Pl. in Social Security Appeal
Pursuant to L.R. 7.3 ("Opening Br.") 2; Def.'s Mem. in Support of the Comm'r's Decision ("Def.'s Mem.") 1 n.1.)
Although Chadwick also filed an application for Supplemental Security Income ("SSI"), this claim was dismissed
because there was no appropriate survivor or evidence to indicate that Chadwick had authorized interim assistance
reimbursement to a state. (Tr. 8-9.) As such, this Court has jurisdiction over only the appeal from the denial of
Chadwick's DIB application.

[2] All parties have consented to the Magistrate Judge. (Docket # 11); *see* 28 U.S.C. § 636(c).

disability from June 15, 1995. (Tr. 154-56.) Her alleged onset date was later amended to April 1, 2003, as she did not earn sufficient quarters of coverage for DIB until that date. (Tr. 16; *see* Tr. 157.) Her claim was denied initially and upon reconsideration (Tr. 16, 92-95, 100-06), and Chadwick requested an administrative hearing (Tr. 114-15). Administrative Law Judge ("ALJ") Bryan J. Bernstein conducted a hearing on September 2, 2009, at which Chadwick, who was represented by counsel, and a vocational expert ("VE") testified. (Tr. 16, 37-83.)

On August 17, 2010, the ALJ rendered an unfavorable decision to Chadwick, concluding that she was not disabled because she could perform a significant number of jobs in the national economy despite the limitations caused by her impairments. (Tr. 16-30.) The Appeals Council denied Chadwick's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 2-4.)

Honeysett filed a complaint with this Court on October 25, 2011, seeking relief from the Commissioner's final decision. (Docket # 1.) In her appeal, Honeysett argues that the ALJ improperly evaluated the opinion of Dr. Ronald Pancner, whom Honeysett contends was Chadwick's treating psychiatrist, and improperly discredited Chadwick's symptom testimony. (Opening Br. 11-18.)

## II. FACTUAL BACKGROUND[3]

### *A. Background*

At the time of the ALJ's decision, Chadwick was twenty-four years old (*see* Tr. 29, 154), had a ninth-grade education (Tr. 51), and had previously worked as a cashier, cook, and restaurant manager/fast food worker (Tr. 29, 259). Chadwick alleges that she became disabled

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 1159-page administrative record necessary to the decision.

due to fibromyalgia, interstitial cystitis, irritable bowel syndrome, scoliosis, degenerative disk disease, headaches, bipolar disorder, pain disorder with psychological factors and a medical condition, personality disorder, anxiety disorder with panic attacks, and a learning disability. (Opening Br. 2.)

## B. Chadwick's Testimony at the Hearing

At the hearing, Chadwick, who weighed only 89 pounds, testified that she lived with her mother, stepfather, and younger brother. (Tr. 64, 71.) She dropped out of school in the tenth grade and unsuccessfully attempted to get her GED. (Tr. 51-52.) At 16, she began working at Papa John's full time as a trainer and manager. (Tr. 42-44.) Although at the hearing she stated that she worked there for three years, from 2002 to 2005 (Tr. 42-43), her disability report indicates that she worked there for only two years, from 2002 to 2004 (Tr. 163). While working there, she apparently injured her back in the L5 area by lifting sauce. (Tr. 46.)

It appears Chadwick quit her job at Papa John's in 2004—and not 2005 as she testified—after a management change and went to work full time at Lowe's in a summertime position. (Tr. 53-54; *see* Tr. 163 (where Chadwick indicated in a disability report that she worked as a manager at a restaurant from February 2002 to January 2004).) Chadwick stated that although she was guaranteed a spot after the summer, she was let go after three months. (Tr. 54.) According to Chadwick, at Lowe's, her physical problems, specifically her pain issues, started getting worse; she could no longer stand for over eight hours at the cash register and got special permission to sit down when needed and to park by the handicap area. (Tr. 55-57.) She related that because the managers and other employees did not like that she was able to sit when she wanted, she was pushed to the side "where nobody else work[ed]" at the return area because

"nobody wanted to be by [her]." (Tr. 56.) Chadwick then started "slacking off," because, she stated, she was not able to do her work as well; she misplaced objects in the inventory and did not put the returned items away. (Tr. 58.) She further testified that trying to work with people caused her a lot of anxiety, frustration, and depression. (Tr. 58.)

About two years later, in 2007, Chadwick attempted to return to Papa John's as either a cashier or pizza maker, but worked for only about two days before quitting. (Tr. 42, 44.) She stated that it was hard working around people again, particularly answering the phones and dealing with customers, and that she felt like she "didn't know how to do anything anymore" and had "never worked before." (Tr. 45.) She also recounted being "in really bad pain" that made it difficult to bend down to get more food out of the refrigerator or clean. (Tr. 45.) At some point, she also worked at Pizza Hut, where she "had a chance to bus and be a waitress for a week"; she stated that she could not believe how hard it was on her back. (Tr. 46.) Chadwick further indicated in a disability report that she worked at Hungry Howie's from November 2004 to April 2005 and that she stopped working there because she had missed too many days and thought she would be fired so she never returned to work. (Tr. 162-63.)

As for her physical impairments, Chadwick testified that she had scoliosis; fibromyalgia that "causes a lot of pain" in her back, legs, and arms; arthritis in her back and arms; and interstitial cystitis. (Tr. 46-47, 60, 68.) She reported that her fibromyalgia and scoliosis prevent her from working because sitting down too long hurts her back. (Tr. 68.) She stated that she was capable of showering and bathing herself most of the time, but that her mother helps her, "at the most," twice a month. (Tr. 68-69.) While she can use the bathroom independently, she represented that her mother helps her get dressed every day. (Tr. 69.) She is able to drive, but

sometimes experiences road rage that prevents her from doing so.  (Tr. 64-65.)  She can vacuum only her room, does not cook, and does not like shopping with her mother; when she does shop, she waits out in the car.  (Tr. 67.)  She also reported difficulty sleeping.  (Tr. 64.)  Chadwick testified that she had a couple of friends—though not as many since she dropped out of school—that she will go see for an hour at the most.  (Tr. 66.)  In school, she had special accommodations for her physical conditions, such as having a second set of books at home because she was unable to carry them, having a pass that allowed her to go to the nurse's office whenever she needed, being excused from gym class, and having a special parking arrangement.  (Tr. 69-70.)  She reported being absent "very much" at school and missing work at Papa John's two to three times a month.  (Tr. 70-71.)

When asked what she was physically capable of doing, Chadwick testified that she could lift a gallon of milk, could bend forward a little bit with pain, could not squat down, and could walk around the perimeter of a basketball court one time, but only at her own pace.  (Tr. 75-77.)  She represented that she climbs the stairs on her hands and knees.  (Tr. 76.)

Along with her physical impairments, Chadwick indicated that she had attention deficit disorder; anxiety; panic attacks; and bipolar disorder.  (Tr. 63-64, 66.)  She described her bipolar symptoms as highs manifesting in hyper or very angry behavior.  (Tr. 72-73.)  She reported cutting herself since the age of sixteen, but that she was last treated for this a couple of years before the hearing.  (Tr. 74.)

*C.  Summary of the Relevant Medical Evidence*

In July 2001, Dr. Susan Hyatt Ballinger, a pediatric rheumatologist, examined Chadwick. (Tr. 299-301.)  After a physical exam revealing 12 out of 18 trigger points, Dr. Ballinger thought

that Chadwick had fibromyalgia with some significant overlapping psychological factors.  (Tr. 300-01.)  Chadwick had a couple of follow up visits at the Pediatric Rheumatology Clinic in 2001.  (Tr. 595-99.)  In November 2001, Chadwick went to physical therapy twice; however, she was discharged at the end of the month after her mother indicated she would not return.  (Tr. 589.)

By the following July, Chadwick was referred to Diana Osborne, Ph.D., for counseling by her primary care physician after scoring high on a depression survey.  (Tr. 592.)  But both Chadwick and her mother reported that Chadwick was under social pressures at the time of this survey and was now doing fairly well.  (Tr. 592.)  Dr. Osborne noted that Chadwick did have occasional episodes of depression, often secondary to pain or social issues.  (Tr. 592.)

In December of 2002, Chadwick saw Dr. Ballinger once again.  (Tr. 593-94.)  Chadwick reported that things were going pretty badly, she was having panic attacks, and she was wearing a back brace for a L5 stress fracture.  (Tr. 593.)  Dr. Ballinger's impressions were fibromyalgia, but also that Chadwick was not taking her medications, doing exercises, or in counseling.  (Tr. 594.)

A MRI of Chadwick's spine performed in March 2004 showed mild scoliosis of the thoracic spine, but "[n]o specific findings related to reported pain and numbness . . . ."  (Tr. 418.)  The following month, Chadwick saw Dr. Bryan D. Kaplansky for a consultation.  (Tr. 383-84.)  His impressions were chronic back pain that appeared to be primarily myofascial, mild thoracic scoliosis, reported history of fibromyalgia, reported history of a "L5" abnormality that required a brace, and depression.  (Tr. 384.)  Chadwick returned to Dr. Kaplansky in May and July; her physical examinations on both visits were normal.  (Tr. 381-82.)  During the July visit,

Chadwick reported that she was laid off work due to, she thought, her restrictions. (Tr. 381.)

Physical examinations performed between September 2004 and February 2006 continued to be within normal limits. (Tr. 535, 670, 672, 674, 676, 678, 680-85, 703-13.) In February 2006, Chadwick saw Marjorie Burns, a social worker at Park Center, for a psychological evaluation. (Tr. 427-31.) Chadwick reported depression with suicidal ideation and self-cutting, feelings of worthlessness, wide mood swings, anger problems, poor sleep and concentration, racing thoughts, and a tendency to isolate. (Tr. 427, 429.) Ms. Burns diagnosed her with major depression, recurrent, without psychotic features; borderline personality disorder; and chronic pelvic pain and bleeding. (Tr. 429.) A treatment plan was formulated (Tr. 429), but the record contains no evidence of follow-up therapy. For the rest of 2006, Chadwick's physical exams remained within normal limits. (Tr. 537, 539, 541, 543, 545, 547-54.)

In December 2006, Chadwick's mother referred her to Pancner Psychiatric Associates, P.C., where Honeysett was currently a patient, for attention deficit hyperactivity disorder ("ADHD"). (Tr. 525.) Paul Pancner, Psy.D., evaluated Chadwick. (Tr. 525-29.) Dr. P. Pancner noted that Chadwick had an extensive history of learning disorders and complained of depression; difficulty with sleep initiation and maintenance; poor energy, motivation, and interest levels; feelings of low self-worth, hopelessness, and helplessness; prior suicidal thoughts, but none currently; and chronic and constant anxiety. (Tr. 525.) He indicated that Chadwick affirmed many symptoms of bipolar disorder, such as almost overly happy periods sometimes including excessive spending and hyper-sexuality and times of depression and irritability. (Tr. 526.) He also expressed concern that Chadwick may be anorexic as she was fixated on the idea of weighing no more than 93 pounds "ever." (Tr. 526.) Chadwick reported

seeing at least one or two psychiatrists in the past as well as counselors Ms. Osborne and Ms. Burns; Dr. P. Pancner noted that she has not had any inpatient psychiatric treatment. (Tr. 526.) Regarding substance abuse, Chadwick told Dr. P. Pancner that she had used cocaine up to eight months ago at her last place of employment; marijuana, as often as two times per month, with her last use a year ago; and "X," a hallucinogen, three times, two years ago. (Tr. 527.)

Dr. P. Pancner found that during her assessment, Chadwick was grossly oriented in terms of person, place, time, and situation; was alert, open, and cooperative; walked with somewhat of an abnormality in her gait, but had no psychomotor agitation or retardation; her affect was primarily depressed; her mood was described as being depressed; her thoughts were not tangential or circumstantial; and she complained of poor short-term memory although her recent and remote memory were grossly intact, but not formally tested. (Tr. 527.) Dr. P. Pancner estimated that she was of low average to average intelligence based on her vocabulary use. (Tr. 527.) Ultimately, Dr. P. Pancner diagnosed Chadwick with depression, NOS, vs. major depression, recurrent moderate; generalized anxiety disorder; rule-out bipolar disorder, type II; ADHD vs. impulse control disorder, NOS; rule-out anorexia nervosa; rule-out personality disorder, NOS; learning disorder, NOS, by history; chronic pain; fibromyalgia; interstitial cystitis; scoliosis; thyroid problems; pinched nerve; irritable bowel syndrome; and TMJ. (Tr. 528.) He further recommended a follow-up visit with Dr. Ronald Pancner for a psychiatric evaluation. (Tr. 528.) The record is unclear as to whether this follow-up occurred.[4] In February of 2007, Dr. P. Pancner wrote a letter to Chadwick explaining that her diagnoses were "not

_____

[4] In the disability report that Chadwick completed on December 19, 2006, she listed Dr. Ronald Pancner as one of her doctors, indicating that her first appointment was that month and that her next appointment was January 6, 2007, when she was "[s]cheduled for testing." (Tr. 166.) The record, however, contains no evidence that this testing with Dr. R. Pancner actually occurred.

clearly established" as of yet and that her physical problems complicated her diagnostic picture. (Tr. 805.)

In January 2007, Dr. M. Ruiz, a state agency physician reviewed the evidence and opined that Chadwick did not have a severe physical impairment. (Tr. 564.) A second state agency physician later affirmed this assessment. (Tr. 587.)

The following month, Daniel Hauschild, Psy.D., performed a consultative exam on Chadwick at the request of the state agency. (Tr. 565-70.) Chadwick reported difficulty sleeping; no appetite; no energy such that she only bathes or gets dressed when she has an appointment; not enjoying anything except art work on rare occasions for an hour at the most; feeling worthless and hopeless "all the time, every day"; and having suicidal thoughts. (Tr. 565-66.) As for her daily living activities, Chadwick reported that she spends most of her day laying in bed watching TV; that she takes a couple of showers daily (which Dr. Hauschild noted contradicted her earlier statement about bathing); she has a boyfriend who visits her, but she has him leave after about a half hour; that she can dress herself, but needs help bathing; that she cannot vacuum; that some days she could do the dishes and laundry and other days she needed help; she can use the phone or microwave independently; she can sometimes drive subject to her road rage; and she needs help with shopping because she cannot recall what she needs to get even with a list. (Tr. 566-67.) She was friendly, cooperative, calm, and alert during the evaluation and maintained good eye contact, but her mood appeared depressed, anxious, and irritable. (Tr. 569.) Dr. Hauschild noted that Chadwick's statements about her symptoms were "dramatically extreme," but that her emotional reaction was not. (Tr. 569.) He subsequently diagnosed her with major depressive disorder, recurrent, severe, without psychotic features;

learning disorder, NOS, per available records; personality disorder, NOS; fibromyalgia; interstitial cystitis; and shortness of breath.  (Tr. 570.)

In March 2007, Joelle J. Larsen, Ph.D, a state agency psychologist reviewed Chadwick's record and opined that she did not have a severe mental impairment.  (Tr. 573.)  A second state agency psychologist later affirmed this assessment.  (Tr. 588.)

Over a year later, in May 2008, Dr. Ronald Pancner, who wrote that he had first seen Chadwick in December 2006, diagnosed Chadwick with bipolar disorder, type II, mixed; anxiety disorder, NOS; ADHD; and rule-out anorexia nervosa.  (Tr. 800.)  He also indicated that she suffered from panic attacks that result in complete inability to function independently outside of her home and had some obsessive-compulsive symptoms.  (Tr. 800-01.)  Dr. R. Pancner further opined that Chadwick had marked restrictions in her activities of daily living; marked difficulty in maintaining social functioning; had deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner; and had experienced repeated episodes of decompensation.  (Tr. 801-02.)  He then concluded that, out of twenty mental work-related activities, Chadwick was moderately to markedly limited in her ability to perform fifteen such activities, extremely limited in two, and not significantly limited in three.  (Tr. 802-03.)  Ultimately, Dr. R. Pancner opined that Chadwick was "unable to function in occupational settings since 2004 due to physical illnesses and mental disorders," that multiple physical problems complicated her mental disorders, and that her prescribed medications can negatively affect her judgment, coordination, stamina, and cognitive functioning.  (Tr. 804.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record, but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an

impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, with respect to steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On August 17, 2010, the ALJ rendered his decision. (Tr. 16-30.) At step one of the analysis, the ALJ found that Chadwick had not engaged in substantial gainful activity since April 1, 2003, her amended alleged onset date. (Tr. 18.) The ALJ then concluded at step two that Chadwick had severe impairments. (Tr. 18-19.) Nonetheless, at step three, the ALJ determined

---

[5] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

that Chadwick's impairment or combination of impairments did not meet or medically equal a listing. (Tr. 19.) Before proceeding to step four, the ALJ determined that Chadwick had failed to establish with reliable evidence that she experiences limitations that would be more restrictive than the limitations accommodated in the following RFC:

> The claimant's physical impairments, including her severe fibromyalgia, render her unable to stand or walk longer than 50% of an eight-hour work day. She needs to be able to alternate between sitting and standing while working. She cannot reach extreme postures (such as stooping, kneeling, bending, etc.) more often than occasionally. In addition, the claimant cannot walk or stand for more than thirty minutes at a time and she is able to lift and carry just ten pounds occasionally and three pounds frequently. She cannot successfully engage in work demanding constant manipulation involving fine work, gripping, grasping, twisting, turning, picking, pushing, or pulling with her hands or fingers. She also cannot work in atmospheric concentrations of dust, smoke, and chemical fumes, or temperature and humidity extremes that would not be as comfortable as ordinary retail, commercial environments.

> The claimant's mental impairments, including her severe bipolar disorder, anxiety, attention deficit hyperactivity disorder, possible anorexia, personality disorder, pain disorder, and learning disorders, render her unable to perform work that imposes close regimentation of production. . . . In addition, the claimant is unable to address work that imposes intense contact with the public or strangers. Such work exposes employees to the emotional challenges of strangers who may have a personal response that disturb[s] sensitive individuals.

(Tr. 27-28.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Chadwick was unable to perform any past relevant work. (Tr. 29.) At step five, however, the ALJ determined that Chadwick could perform a significant number of unskilled sedentary jobs within the economy, including table worker, final assembler (optical), and lens inserter (optical). (Tr. 29.) Thus, Chadwick's claim for DIB was denied. (Tr. 30.)

*C. Substantial Evidence Supports the ALJ's Discounting of Dr. Ronald Pancner's Opinion*

On Chadwick's behalf, Honeysett first argues that the ALJ improperly evaluated the

opinion of Dr. Ronald Pancner, a psychiatrist at Pancner Psychiatric Associates. (Opening Br. 11-14.) In May 2008, Dr. Ronald Pancner completed a medical source statement[6] for Chadwick, opining, among other limitations, that she was moderately to markedly limited in her ability to perform fifteen of twenty mental work-related activities and extremely limited in two such activities. (Tr. 801-02.)

As an initial matter, the parties dispute whether Dr. R. Pancner is a treating or examining psychiatrist. (*Compare* Def.'s Mem. 7-8, *with* Opening Br. 11, *and* Reply Br. 4.) The regulations define a treating source as a physician, psychologist, or other acceptable medical source "who has, or has had, an ongoing treatment relationship with [the claimant]." *Morgan v. Astrue*, No. 11 C 2220, 2012 WL 1108307, at *4 (N.D. Ill. Apr. 2, 2012) (quoting 20 C.F.R. § 404.1502). As such, "[a] doctor who only examines a [claimant] once does not have an ongoing relationship with [the claimant], and accordingly, fits the definition of a non-treating source." *Id.* (citing *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005)); *accord Sellinger v. Astrue*, No. 1:10-cv-01141-DML-RLY, 2011 WL 3902816, at *8 (S.D. Ind. Sept. 6, 2011); *see also* 20 C.F.R. § 404.1502 ("Nontreating source means a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you."). Generally, a claimant has an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that she sees, or has seen, "the source with a frequency consistent with the accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." 20 C.F.R. § 404.1502.

---

[6] Although Chadwick represents that both Dr. Paul Pancner and Dr. Ronald Pancner completed this medical source statement (Opening Br. 11), as the Commissioner points out, only Dr. Ronald Pancner signed the form (Def.'s Mem. 5 n.3).

And "a psychologist is not a treating source if the relationship 'is based not on [the claimant's] need for treatment or evaluation, but solely on [the claimant's] need to obtain a report in support of [the claim] for disability.'" *Rojas v. Astrue*, No. 09-C-5587, 2010 WL 4876698, at *9 n.4 (N.D. Ill. Nov. 19, 2010) (quoting 20 C.F.R. § 416.902).

Here, the record contains evidence of only one interaction between Chadwick and Dr. *Ronald* Pancner—his May 2008 medical source statement (Tr. 800-04); all of the other evidence from Pancner Psychiatric Associates, P.C., indicates that Dr. *Paul* Pancner saw and treated Chadwick (*see* Tr. 253 (a disability report that Chadwick completed in November 2007 indicating that she last saw Dr. Paul Pancner in May 2007), 525-29, 716-20 (the December 2006 intake performed by Dr. Paul Pancner), 805 (the February 2007 letter Dr. Paul Pancner wrote to Chadwick explaining her diagnoses)). Therefore, assuming that Dr. Ronald Pancner actually examined Chadwick in May 2008, according to the record, this would be the *only* time Dr. Ronald Pancner personally evaluated her. But a doctor who examines a claimant only once does not have an ongoing treating relationship with her and, as such, is a non-treating source. *See White*, 415 F.3d at 658; *Morgan*, 2012 WL 1108307, at *4; *Sellinger*, 2011 WL 3902816, at *8; 20 C.F.R. § 404.1502. And, in his opinion, although the ALJ refers to Dr. Paul Pancner as Chadwick's "former treating psychologist" (Tr. 27), he never calls Dr. Ronald Pancner a treating source (*see* Tr. 20-21 (discussing Dr. R. Pancner's opinion, but never referring to him as a treating source)), and substantial evidence suggests he is not. Accordingly, the "treating physician rule"—that the opinion of a treating source is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence—is not applicable here. *See McCarty v. Astrue*, No.

09-715-GPM, 2011 WL 902493, at *4 (S.D. Ill. Mar. 15, 2011); 20 C.F.R. § 404.1527(c)(2).

Not to be deterred, Honeysett states that "the medical source statement of the Pancner's [sic] indicates that they had been treating her from December of 2006 through May 2008," and as such, she argues that the ALJ failed to fulfill his duty to re-contact a treating physician or psychologist when there was evidence of further treatment. (Opening Br. 14.) First, Dr. *Ronald* Pancner's medical source statement states that Chadwick was first seen in December 2006 and last seen in May 2008. (Tr. 800.) Dr. Ronald Pancner was not asked if Chadwick was seen between these visits—and, more importantly, whether *he* saw her as opposed to Dr. Paul Pancner—and his medical source statement does not otherwise indicate that he saw her more than once, which is consistent with the evidence in the record.[7] Although Dr. Paul Pancner's December 2006 intake evaluation indicates that Chadwick was to be scheduled with Dr. Ronald Pancner for a psychiatric evaluation (Tr. 719), there is no evidence in the record that such an evaluation occurred. And while Chadwick's December 2006 disability report mentions this upcoming appointment (*see* Tr. 166), Chadwick never lists Dr. Ronald Pancner as one of her doctors in her later report, instead listing only Dr. Paul Pancner (*see* Tr. 253).

Regardless, Chadwick was represented by counsel at her hearing. "When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits." *Glenn* v. *Sec'y Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987). And while this "assumption does not eliminate the ALJ's obligation to develop the record sufficiently to make a proper decision,"

---

[7] Even though it appears that Chadwick may have seen Dr. Paul Pancner between these visits (*see* Tr. 253 (Chadwick's November 2007 disability report in which she indicates she last saw Dr. Paul Pancner in May 2007 and was scheduled for an appointment with him that month)), there is no indication that she saw Dr. Ronald Pancner.

*Silva v. Barnhart*, No. 02 C 5681, 2003 WL 22425010, at *11 (N.D. Ill. Oct. 23, 2003) (citing

*Ray v. Bowen*, 843 F.2d 998, 1006-07 (7th Cir. 1988)), Honeysett, who is also represented by

counsel, has not submitted any putative "missing" records from either Dr. Pancner or explained

what they might contain and has not even affirmatively stated that such records actually exist,

only suggesting that "there is evidence of further treatment" (Opening Br. 14). *See Jones v.*

*Massanari*, No. 01-C-0024-C, 2001 WL 34382025, at *10 (W.D. Wis. Oct. 18, 2001). But

"[m]ere conjecture or speculation that additional evidence might have been obtained in this case

is insufficient to warrant a remand." *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994)

(citation omitted).

Therefore, having established that Dr. Ronald Pancner was a non-treating source, his

opinion must be evaluated pursuant to the following factors in order to determine the proper

weight to apply to it: (1) the length of the treatment relationship and frequency of examination;

(2) the nature and extent of the treatment relationship; (3) how much supporting evidence is

provided; (4) the consistency between the opinion and the record as a whole; (5) whether the

treating physician is a specialist; and (6) any other factors brought to the attention of the

Commissioner. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); 20 C.F.R. § 404.1527(c); *see*

*White*, 415 F.3d at 658-60; *Windus v. Barnhart*, 345 F. Supp. 2d 928, 939-43 (E.D. Wis. 2004);

*Lechner v. Barnhart*, 321 F. Supp. 2d 1015, 1031-32 (E.D. Wis. 2004).

The ALJ here did not give significant weight to Dr. R. Pancner's May 2008 opinion,

which suggested that Chadwick was, at the very least, markedly to extremely limited in her

ability to perform most mental activities, as his opinion was not consistent with the record as a

whole and was not supported very well by either Dr. Pancner's medical records because they

contained very little detail regarding actual treatment and findings. (Tr. 21.)

The ALJ can properly consider—and, as matter of fact, *must* consider—the consistency between a doctor's opinion and the record as a whole, *see Books*, 91 F.3d at 979; 20 C.F.R. § 404.1527(c)(2)(4), which is exactly what the ALJ here did in deciding what weight to give Dr. R. Pancner's opinion. Specifically, the ALJ found that Dr. R. Pancner's opinion would not receive significant weight and was not consistent with the record as a whole because (1) Chadwick had seen many other physicians since 2003 and none had indicated that her mental functioning was as compromised as Dr. R. Pancner found it, (2) she had not been hospitalized on an inpatient basis for a psychiatric reason, and (3) she had worked since 2003, although not at substantial gainful activity levels. (Tr. 21.) As to this first reason, an ALJ can consider that one doctor's extreme limitations are inconsistent with other medical opinions and evidence in the record. *See Elkins v. Astrue*, No. 4:10-cv-74-WGH-RLY, 2011 WL 2728398, at *11 (S.D. Ind. July 11, 2011) (affirming ALJ's decision not to give controlling weight to a treating doctor's opinion when the doctor's extreme findings were inconsistent with numerous other medical opinions and evidence in the record); *Harder v. Astrue*, No. 3:09-cv-43-WGH-RLY, 2010 WL 3447538, at *11 (S.D. Ind. Aug. 30, 2010) (same).

Moreover, the ALJ's reason—that no other physician indicated her functioning was as compromised as Dr. R. Pancner found it—is supported by substantial evidence. In February 2006, Ms. Burns of Park Center found that Chadwick suffered from depression and had a long history of feeling hopeless, helpless, and worthless, poor sleep and concentration, racing thoughts, and a tendency to isolate. (Tr. 429.) Chadwick's mental status exam was fairly unremarkable beyond these noted difficulties. (*See* Tr. 428-29.) Dr. P. Pancner's evaluation of

Chadwick in December 2006 was also less limited than Dr. R. Pancner's opinion; while he noted that she had a depressed affect and prior suicidal thoughts, he estimated that she was of low average to average intelligence, was grossly oriented in terms of person, place, time, and situation, and had good insight and judgment at that point in time. (Tr. 527.) And during Dr. Hauschild's consultative exam in February 2007, Dr. Hauschild found her to have a friendly and cooperative attitude; a casual, constricted, and nonchalant affect; and to be of average intelligence. (Tr. 569.) While her mood seemed depressed, anxious, and irritable, Dr. Hauschild further noted that her statements about her symptoms were "dramatically extreme," but her emotional reaction was not. (Tr. 569.) Finally, the state agency psychologists, who admittedly did not examine Chadwick, concluded that she did not even have a severe mental impairment. (Tr. 573, 588.) As such, substantial evidence supports the ALJ's first reason for finding Dr. R. Pancner's opinion not consistent with the record as a whole.

Regarding the ALJ's next reason for finding this inconsistency—that Chadwick had not been hospitalized on an inpatient basis for a psychiatric reason—Honeysett argues that the ALJ "played doctor" in coming to this conclusion. (Opening Br. 13; Reply Br. 3.) According to the Seventh Circuit Court of Appeals, cases requiring reversal because an ALJ impermissibly "played doctor" are ones in which the ALJ failed to address relevant evidence, *Dixon*, 270 F.3d at 1177; *see, e.g.*, *Clifford*, 227 F.3d at 870 (reversing because ALJ disregarded treating physician's opinion that the claimant had arthritis without citing any conflicting evidence in the record), or when the ALJ drew medical conclusions himself about a claimant without relying on medical evidence, *see, e.g.*, *Myles v. Astrue*, 582 F.3d 672, 677-78 (7th Cir. 2009); *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000). Moreover, an ALJ who rejects the medical opinions of

record and then constructs his own RFC without supporting medical evidence also impermissibly plays doctor. *Bailey v. Barnhart*, 473 F. Supp. 2d 822, 839 (N.D. Ill. 2006); *see, e.g.*, *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012) (determining that the ALJ played doctor when he constructed his own RFC by rejecting a physician's findings without explaining his reasons for doing so); *Muzzarelli v. Astrue*, No. 10 C 7570, 2011 WL 5873793, at *26-27 (N.D. Ill. Nov. 18, 2011) (finding that the ALJ impermissibly "played doctor" by using his own judgment without relying on any part of the record or on the medical expert's testimony).

In the instant case, the ALJ did none of these things. Rather than impermissibly concluding from Chadwick's lack of inpatient psychiatric hospitalizations that she did not have a severe mental impairment—in fact, the ALJ found that Chadwick suffered from mental impairments, including "severe bipolar disorder, anxiety, attention deficit hyperactivity disorder, possible anorexia, personality disorder, pain disorder, and learning disorders" (Tr. 27-28)—the ALJ used this lack of hospitalizations as simply one reason why Dr. R. Pancner's opinion was not consistent with the record as a whole such that it was not given significant weight (*see* Tr. 21).

Furthermore, although Honeysett argues that the ALJ did not explain how the lack of hospitalizations undercuts Dr. R. Pancner's opinion and, as such, there is not substantial evidence to support this reason, the ALJ is required only to articulate, at least at some minimal level, his analysis of the evidence to allow this Court to trace the path of his reasoning and conduct an informed review. *Zurawski*, 245 F.3d at 888. Here, the Court is able to do so; the ALJ used the fact that Chadwick was not hospitalized for a psychiatric reason as one illustration

of how Dr. R. Pancner's opinion that Chadwick was, at the very least, markedly or extremely limited in her ability to perform most mental activities was not consistent with the record as a whole.

And the ALJ offered yet another reason why Dr. R. Pancner's opinion was not consistent with the record as a whole—that Chadwick had worked since 2003, though not at substantial gainful activity levels. (Tr. 21.) The ALJ was permitted to consider Chadwick's work history, which included working full time as a manager and trainer at Papa John's for two years, at Lowe's for three months, and at Hungry Howie's. *See Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("Although the diminished number of hours per week indicated that [the claimant] was not at his best, the fact that he could perform some work cuts against his claim that he was totally disabled."). Before specifically considering Dr. R. Pancner's opinion, the ALJ further noted that Chadwick had worked since her alleged onset date, which "suggests that she is not completely unable to engage in some simple repetitive tasks." (Tr. 20.) Although the ALJ does not explicitly say so, this would seem to be inconsistent with Dr. R. Pancner's opinion finding that Chadwick was moderately to extremely limited in seventeen out of twenty mental work-related activities. As such, while perhaps the ALJ could have been more explicit in his reasoning, he nonetheless met his duty of minimal articulation in discounting Dr. R. Pancner's opinion. *See Liskowitz v. Astrue*, 559 F.3d 736, 746 (7th Cir. 2009) (holding that, while it would have been better if the ALJ gave a "better-reasoned basis" for rejecting a treating physician's opinion, the ALJ's decision was nonetheless supported by substantial evidence); *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985) ("If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's

reasoning, the ALJ has done enough.").

Moreover, when deciding the weight to give to a medical source's opinion, the ALJ must consider, among other factors, how much supporting evidence is provided. *Books*, 91 F.3d at 979; 20 C.F.R. § 404.1527(c). The ALJ here did just that when evaluating Dr. R. Pancner's opinion, noting that "medical records from either Dr. Pancner contain little detail regarding treatment and findings for the claimant; thus they do not support Dr. Pancner's opinion very well." (Tr. 21.) The ALJ's statement would appear to be correct; as noted above, the record contains evidence of only a handful of interactions between Chadwick and Pancner Psychiatric Associates, P.C. (Tr. 525-29, 716-21, 800-05; *see* Tr. 253), none of which include any detail about the further treatment Chadwick received there—if any—or, apparently, any conclusive diagnoses (*see* Tr. 805 (where Dr. P. Pancner informed Chadwick that her diagnoses were "not clearly established [ ] as of yet"). Accordingly, the ALJ's discounting of Dr. R. Pancner's opinion is supported by substantial evidence.

Finally, any error that the ALJ may have made when considering Dr. R. Pancner's opinion would ultimately be harmless as his opinion was opining as of May 2008, over a year after Chadwick's date last insured of March 31, 2007. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (stating that an ALJ's error is harmless where, having looked at the evidence in the record, the court "can predict with great confidence what the result on remand will be"); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (concluding that an error is harmless when it "would not affect the outcome of the case"). And, although Dr. R. Pancner opined that Chadwick "has been unable to function in occupational settings since 2004 due to physical illness and mental disorders" (Tr. 803), it appears from the record that Dr. Ronald Pancner only

saw Chadwick in May 2008 (Tr. 800-04), more than a year after her date last insured, and that

his partner, Dr. Paul Pancner, first saw her in December 2006 (Tr. 525-29, 716-20). *See Hoover*

*ex rel. Hoover v. Astrue*, No. 10-832-JPG-CJP, 2012 WL 482226, at *7 (S.D. Ill. Jan. 6, 2012)

(finding an ALJ's error in considering a doctor's opinion harmless where the doctor saw the

claimant for the first time more than a year after the date last insured). While retrospective

opinions are permissible, "[a] retrospective diagnosis may be considered only if it is

corroborated by evidence contemporaneous with the eligible period." *Estok v. Apfel*, 152 F.3d

636, 640 (7th Cir. 1998). But, as the ALJ noted several times in his opinion, Chadwick was able

to work in 2004 and 2005 (*see* Tr. 20-22, 26)—albeit not at substantial gainful activity

level—which undercuts Dr. R. Pancner's retrospective opinion penned four years later.

Even though the ALJ did not give this—that Dr. R. Pancner's opinion was given a year

after the date last insured—as a reason for discounting his opinion, this omission is easily

explainable. When Chadwick's case was before the ALJ, she was claiming both DIB and SSI

benefits, the latter of which is not affected by her date last insured. Now, however, only her DIB

claim is before the Court, which requires her to establish that she was disabled as of March 31,

2007, her date last insured, to recover DIB benefits, *Stevenson*, 105 F.3d at 1154. Therefore, her

date last insured is substantially more important than before. Nevertheless, even without this

explanation, any error the ALJ made in discounting Dr. R. Pancner's opinion would be harmless,

thereby precluding remand.

### D. The ALJ's Credibility Determination Will Not Be Disturbed

Along with challenging the ALJ's discounting of Dr. R. Pancner's opinion, Honeysett

argues that the ALJ improperly evaluated the credibility of Chadwick's testimony. (Opening Br.

14-18.)  Like her first argument, however, Honeysett's second challenge is ultimately unpersuasive.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference.  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray*, 843 F.2d at 1002; *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

Here, the ALJ found that Chadwick's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely persuasive for a number of reasons, including the following: (1) that her interstitial cystitis and urinary problems were not severe because they had not lasted long enough to cause enduring impairments (Tr. 24); (2) the evidence did not support a finding that Chadwick experienced severe degenerative lumbar disk disease (Tr. 25); (3) she did not exhibit any muscle atrophy, which would be expected if she were as inactive as she alleged (Tr. 25); (4) she described herself as an individual who is essentially unable to engage in physical activities, often bedridden, suffers from disabling limits in concentration, and socially isolated, which is not consistent with the record as a whole (Tr. 26); (5) she worked at several different places in 2003, 2004, and 2005, which, because such

work required sustained attention to work functions, suggests she was not as limited as she alleged (Tr. 26); (6) despite her neglected education and alleged learning disorders, her intelligence was measured as at least average and she was able to work as a manager in a pizza shop (Tr. 26); (7) she reported being able to spend hours on the computer as long as she was lying down, babysitting her younger brother, playing video games, and watching movies (Tr. 26-27); (8) she indicated that her ability to perform her activities of daily living was limited mainly due to her physical impairments, not her mental ones (Tr. 27); (9) she made contradictory statements about whether she had friends (Tr. 27); (10) she admitted to using illegal drugs in the past (Tr. 27); (11) her mental health treatment had been sporadic and she was not hospitalized on an inpatient basis for a psychiatric reason (Tr. 27); (12) she failed to follow treatment suggestions for her physical conditions (Tr. 27); and (13) the objective medical evidence did not support the degree of limitation alleged by Chadwick with regard to her physical condition (Tr. 27).

As suggested above, the ALJ spent at least five pages discussing Chadwick's credibility and gave several reasons for discounting her symptom testimony (*see* Tr. 22-27), creating "an accurate and logical bridge between the evidence and the result" in doing so, *Ribaudo*, 458 F.3d at 584. The ALJ properly considered Chadwick's activities of daily living, particularly that she was able to work from 2003 to 2005, which cuts against her claim of disability, *see Berger*, 516 F.3d at 546. And while Honeysett argues that the ALJ's statement that disability means "inability to work" is a legal error requiring a remand, this amounts to nothing more than a dislike of the ALJ's phraseology. *See Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) ("All of the ALJ's analysis is amply supported by the hearing record, and [the claimant's] argument

amounts to nothing more than a dislike of the ALJ's phraseology.").

Perhaps if the ALJ had stopped there, without explaining his analysis, Honeysett's argument would have some merit. But the ALJ continued on, stating that Chadwick's ability to work was "significant as it apparently required substantial attention to work functions" and, as such, strongly suggests that she was not as limited as either she or her mother alleged. (Tr. 26.) In doing so, the ALJ properly considered as a factor in his credibility analysis that in the two years following her alleged onset date, Chadwick's daily activities included performing some work; yet, he did not improperly equate this evidence with an ability to work full time. *Compare Schmidt*, 395 F.3d at 746-47 (considering the claimant's performance of daily activities as a factor when discounting claimant's credibility), *and Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004), *with Mendez v. Barnhart*, 439 F.3d 360, 362-63 (7th Cir. 2006) (cautioning ALJs "against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home"), *and Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005). Moreover, the ALJ used her work history, particularly her management job at Papa John's, to discount her allegations of severe learning disorders because, as the ALJ explained in the immediately preceding paragraph, this work would "apparently require sustained attention to work functions." (Tr. 26.)

In any event, Chadwick's work history was not the only reason the ALJ found Chadwick's testimony not entirely credible. *See, e.g.*, *Martz v. Astrue*, No. 1:07-CV-00219, 2008 WL 975051, at *5-6 (N.D. Ind. Apr. 8, 2008) (affirming the ALJ's credibility determination where the ALJ considered the fact that plaintiff worked part time after her alleged onset date as just one factor in the credibility analysis). The ALJ also considered the

contradictory statements about whether she had friends, specifically noting that she also had a boyfriend at times, and properly discounted her credibility based on this inconsistency. *See Hill v. Astrue,* No. 1:08-cv-0740-DFH-JMS, 2009 WL 426048, at *10 (S.D. Ind. Feb. 20, 2009) (discounting a claimant's credibility where discrepancies were noted between her testimony and her statements to her physicians); *Stubbs v. Apfel*, No. 97 C 7069, 1998 WL 547107, at *8 (N.D. Ill. Aug. 20, 1998) (same); 20 C.F.R. § 404.1529(c)(4); SSR 96-7p ("One strong indication of the credibility of an individual's statements is their consistency . . . . The adjudicator must consider such factors as . . . [t]he consistency of the individual's own statements."). As to this reason, Honeysett argues that the ALJ was "not very clear" about which statements regarding Chadwick's friends were inconsistent. (Opening Br. 17.) But a review of the record supports the ALJ's conclusion. (*Compare* Tr. 187 (in which Chadwick notes in January 2007 that she may go see a couple of friends), *and* Tr. 216 (where Chadwick states in August 2007 that she may have her boyfriend take her to a friend's house), *with* Tr. 198 (in which Chadwick states in July 2007 she "no longer has any friends").) And there are more inconsistent statements by Chadwick in the record. Dr. Hauschild specifically noted such an inconsistency in his consultative exam—that Chadwick's statement that she took "a couple of showers daily" contradicted her earlier statement in the same examination that she only bathes or gets dressed when she has an appointment with someone. (Tr. 565-66.)

The ALJ still offered several other reasons for discrediting Chadwick, one of which was that the objective medical evidence of record did not support the degree of limitation alleged. (Tr. 27.) Of course, an ALJ is entitled to consider the objective medical evidence, or lack thereof, as a factor in assessing credibility and "may properly discount portions of a claimant's

testimony based on discrepancies between [the c]laimant's allegations and objective medical evidence." *Crawford v. Astrue*, 633 F. Supp. 2d 618, 633 (N.D. Ill. 2009); *see Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Smith v. Apfel*, 231 F.3d 433, 439 (7th Cir. 2000) ("[A]n ALJ may consider the lack of medical evidence as probative of the claimant's credibility."); 20 C.F.R. § 404.1529(c)(2); SSR 96-7p. Moreover, as Dr. Hauschild explicitly noted "[Chadwick's] statements about her symptoms were dramatically extreme." (Tr. 569.)

Nonetheless, despite the ALJ's comprehensive analysis, Honeysett still takes issue with several of the ALJ's reasons, none of which amount to any more than nitpicking, which this Court will not entertain. *See Rice*, 384 F.3d at 369 (explaining that when reviewing the ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it"). For instance, Honeysett argues that the ALJ failed to evaluate Chadwick's mental condition in combination with her physical problems, specifically that she suffered from a pain disorder that is associated with both psychological factors and a general medical condition. (Opening Br. 16.) Contrary to Honeysett's assertion, "[n]o evidence in the record suggests that the ALJ failed to consider the combined effects of [Chadwick's] impairments." *Robinson v. Apfel*, No. 97 C 8727, 1999 WL 160068, at *7 (N.D. Ill. March 12, 1999). In fact, the ALJ's decision reflects just the opposite, as he expressly contemplated the combination of Chadwick's impairments in his five-step analysis. (*See* Tr. 17 (indicating that when assigning a RFC, he must consider "all of the claimant's impairments, including those that are not severe"), 21(stating that he considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with

28

the objective medical evidence and other evidence").)  Indeed, the ALJ's discussion of the evidence of record was *extremely* thorough, as he penned more than seven pages when discussing in detail Chadwick's various impairments.  (*See* Tr. 21-28.)  As to Chadwick's pain disorder specifically, the ALJ expressly noted this condition in his opinion (Tr. 26, 27), and, even if he had not, it appears that Chadwick was first diagnosed with a pain disorder in July 2009 (*see* Tr. 856-57), over two years after her date last insured.

Moreover, Honeysett claims that the ALJ did not explain how Chadwick's daily living activities were consistent with her testimony.  (Opening Br. 16.)  But reading the decision as a whole, as this Court is required to do, *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) (unpublished) ("[W]e read the ALJ's decision as a whole and with common sense."); *Secrest v. Astrue*, No. 1:09-cv-00708-JMS-RLY, 2010 WL 2071360, at *5 (S.D. Ind. May 21, 2010) (same), the ALJ's logic is easy to trace.  First, the ALJ noted that, based on Chadwick's testimony, she was an individual who is essentially unable to engage in any physical activities, often bedridden, suffers from disabling limits in concentration, and socially isolated. (Tr. 26.)  In the next three paragraphs, the ALJ lays out these inconsistencies.  (*See* Tr. 26-27.) Chadwick's ability to work in 2003, 2004, and 2005 at jobs requiring sustained attention to work functions conflicts with her testimony regarding her inability to engage in physical activities and her concentration difficulties—the latter of which the ALJ specifically noted earlier on in his opinion (*see* Tr. 20 ("Although she alleged having problems with concentration, she engaged in work activity since April 1, 2003[.]")—as does her ability to work as a *manager* in a pizza shop. Chadwick's testimony that she can spend hours on the computer when lying down similarly contradicts her testimony of disabling limits in concentration.  And the evidence that Chadwick

had friends, not to mention a boyfriend at times, contradicts her testimony of social isolation. Although the ALJ may not have explicitly expressed these inconsistencies, he minimally articulated his reasoning and created a logical bridge between the evidence and result.

Furthermore, the ALJ did not discredit Chadwick's symptom testimony in its entirety; he still accounted for Chadwick's alleged difficulties with social interaction and maintaining concentration, persistence, or pace in his RFC by restricting her from work imposing intense contact with the public or close regimentation of production.  (*See* Tr. 27-28); *see, e.g.*, *Vincent v. Astrue*, No. 1:07-cv-28, 2008 WL 596040, at *16 (N.D. Ind. Mar. 3, 2008) (affirming ALJ's credibility determination where he discredited the claimant's symptom testimony only in part)

As to Honeysett's remaining nitpicks of the ALJ's decision, even if discounting Chadwick's credibility because of prior substance abuse was improper, "merely because one reason the ALJ gave for discounting plaintiff's credibility was not proper, does not render the ALJ's credibility determination invalid, as long as it is supported by substantial evidence in the record, as it is in this case."  *Woodsum v. Astrue*, 711 F. Supp. 2d 1239, 1262 (W.D. Wash. 2010).  Similarly, while the ALJ improperly discounted Chadwick's credibility based on her failure to follow medical suggestions without inquiring into the reasons for this noncompliance as required by SSR 96-7p, this error is ultimately harmless as the ALJ gave numerous other permissible reasons for discrediting Chadwick.  Therefore, his decision was not based in large part on the evidence of noncompliance, and, consequently, a remand is not warranted on this basis.  *Cf. B.K.L. ex rel. Love v. Astrue*, No. 1:07-cv-1357-SEB-JMS, 2009 WL 838625, at *4-5 (S.D. Ind. Mar. 26, 2009) (remanding the ALJ's credibility determination based on his failure to make an inquiry into the claimant's reasons for noncompliance when it was "clear that he based

his decision in large part of the evidence that showed noncompliance . . .").  And even if some of the ALJ's findings concerning Chadwick's credibility were a "bit harsh," "an ALJ's assessment will stand 'as long as [there is] some support in the record.'"  *Berger*, 516 F.3d at 546 (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)).

In sum, the ALJ adequately built an accurate and logical bridge between the evidence of record and his conclusion that Chadwick's testimony of disabling impairments was not entirely credible, and his determination is not "patently wrong."  *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000); *Powers*, 207 F.3d at 435.  Therefore, the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, will be affirmed.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Honeysett.

SO ORDERED.

Enter for this 23rd day of August, 2012.

S/Roger B. Cosbey                    
Roger B. Cosbey,
United States Magistrate Judge